FILED
08/28/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2018

IN RE ALEXIS C.

Appeal from the Juvenile Court for Maury County
No. 2016-JV-428    George L. Lovell, Judge
_____

No. M2017-02052-COA-R3-PT
_____

This is a termination of parental rights case involving the parental rights of the mother, Bethany C. ("Mother"), to her minor child, Alexis C. ("the Child"), who was two years of age at the time of trial. The Child was born in 2014 to Mother and Jeremy C. ("Father"). In August 2015, the Maury County Juvenile Court ("trial court") entered an order removing the Child from Mother's custody and placing the Child into the temporary legal custody of the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where she remained at the time of trial. The trial court subsequently entered an order on October 12, 2015, wherein the trial court found that the Child was dependent and neglected due to Mother's and Father's incarceration. On August 23, 2016, DCS filed a petition to terminate the parental rights of Mother and Father. Following a bench trial, the trial court terminated Mother's parental rights to the Child upon determining by clear and convincing evidence that (1) Mother had abandoned the Child by failing to provide a suitable home, (2) Mother had failed to substantially comply with the requirements of the permanency plans, (3) the conditions leading to removal still persisted and other conditions persisted that would in all probability cause the Child to be subjected to further abuse or neglect, and (4) Mother had failed to manifest an ability and willingness to personally assume custody of and financial responsibility for the Child. The court further found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother has appealed.[1] Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

---

[1] The trial court also terminated Father's parental rights to the Child. Father did not appeal the decision of the trial court and is not participating in this appeal. We will therefore confine our analysis to those facts relevant to Mother.

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Daniel L. Murphy, Columbia, Tennessee, for the appellant, Bethany C.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

The underlying dependency and neglect proceedings commenced when Father filed a custody petition on July 28, 2015, alleging that the Child was dependent and neglected in the care of Mother. The trial court entered an emergency temporary custody order, placing the Child into the custody of Father pending a preliminary hearing. The trial court conducted a preliminary hearing on July 30, 2015, determining that probable cause existed to establish that not only was the Child dependent and neglected in the care of Mother but that the Child was also dependent and neglected in the care of Father. As a less drastic alternative to foster care, the trial court ordered that the Child be returned to the custody of Mother "so long as Mother lived in the home of her father, [D.J.], and stepmother, [B.J.]," (collectively, "Grandparents") and so long as Mother was prohibited from leaving the home alone with the Child.

Prior to the adjudicatory hearing, several family members filed separate petitions for custody of the Child, including B.J. and the Child's paternal aunt, K.P., who later served as the Child's foster mother ("Foster Mother"). On August 11, 2015, Foster Mother filed a petition for custody, alleging that the Child was dependent and neglected and requesting that custody of the Child be placed with her. According to K.P., Mother and Father had been arrested, and the Child had been left in the care of Grandparents, who Foster Mother alleged abused prescription drugs.

On August 12, 2015, the trial court denied the petitions for custody and entered a "Bench Order – Custody to DCS," placing the Child into the custody of DCS due to the parents' incarceration. Mother had been arrested for violating a no-contact order with Father, and Father had been arrested on charges of attempted first degree murder, especially aggravated robbery, and aggravated assault. The Child's guardian *ad litem* filed a petition in response to the court's custody order, requesting that the court find the Child dependent and neglected due to the parents' incarceration and the alleged drug use in Grandparents' home. DCS also filed a petition in response to the trial court's bench order, recommending that the Child be placed into the custody of K.P. and requesting that

the court review the Child's status at a preliminary hearing to determine the necessity for continued foster care.

The trial court conducted a preliminary hearing on August 24, 2015, determining that the Child should remain in DCS custody pending further hearing. Following an adjudicatory hearing conducted on October 12, 2015, the trial court found by clear and convincing evidence, upon stipulation by the parties, that the Child was dependent and neglected "due to the incarceration of both [parents] at the time of the court's issuance of the bench order." The trial court further ordered that it was in the best interest of the Child to remain in the custody of DCS.

During the pendency of the dependency and neglect proceedings, the trial court ratified three permanency plans, including plans dated September 9, 2015; January 12, 2016; and July 8, 2016.[2] On September 9, 2015, DCS provided Mother with a copy of the Criteria and Procedures for Termination of Parental Rights. The document was also explained to Mother on that date, and Mother signed it.

DCS filed a petition to terminate the parents' rights on December 8, 2016. The trial court conducted a bench trial concerning the termination petition on March 24, 2017, and subsequently took the matter under advisement. The court entered an order on July 17, 2017, terminating Mother's and Father's parental rights. As to Mother, the trial court found by clear and convincing evidence that (1) Mother had abandoned the Child by failing to provide a suitable home, (2) Mother had not substantially complied with the permanency plans, (3) the conditions leading to the Child's removal from Mother's custody persisted and other conditions persisted that would in all probability cause the Child to be subjected to further abuse or neglect, and (4) Mother had failed to manifest an ability and willingness to assume legal and physical custody of the Child or financial responsibility for the Child. The court further found that termination of Mother's parental rights was in the best interest of the Child. Mother timely appealed.[3]

---

[2] The date provided on the third permanency plan incorrectly reflects the previous permanency plan date; however, the date provided by all parties signing the permanency plan was July 8, 2016.

[3] Mother's notice of appeal was incorrectly filed with the trial court instead of the appellate court clerk. *See* Tenn. R. App. P. 4. Mother had filed her notice of appeal with the trial court clerk on August 11, 2017. Mother did not file her notice of appeal with the appellate court clerk until October 12, 2017. Under the transitional provision of Tennessee Rule of Appellate Procedure 4, Mother's notice of appeal was required to be filed with the appellate court clerk on or before September 5, 2017. The trial court had transmitted a copy of the notice of appeal to this Court on August 17, 2017. Because this Court received a copy of the notice of appeal before September 5, 2017, we have considered Mother's notice of appeal to be timely.

## II. Issues Presented

Mother raises five issues for our review, which we have restated slightly:

1.  Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's abandonment of the Child based on Mother's failure to provide a suitable home.

2.  Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's substantial noncompliance with the permanency plans.

3.  Whether the trial court erred by finding clear and convincing evidence that the conditions leading to removal persisted and that other conditions persisted that would in all probability cause the Child to be subjected to further abuse or neglect.

4.  Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Child.

5.  Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and

convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of four statutory grounds to terminate Mother's parental rights: (1) abandonment by failing to provide a suitable home for the Child, (2) substantial noncompliance with the permanency plans, (3) persistence of the conditions leading to the Child's removal, and (4) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Child. We will address each statutory ground in turn.

## A. Abandonment by Failure to Provide a Suitable Home for the Child

The trial court found that Mother had abandoned the Child based upon the statutory ground of failure to provide a suitable home. Mother contends that DCS failed

to meet its burden of proof to support this ground. Upon a thorough review of the record, we disagree.

Tennessee Code Annotated § 36-1-113(g) (2017) provides in relevant part:

Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (2017) provides:

The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

For the statutory ground of abandonment by failure to provide a suitable home to be applicable, DCS must first prove that the Child had been removed from Mother's home and that the Child had been found by the court to be dependent and neglected.

- 7 -

Termination of parental rights based upon this statutory ground requires proof that the child was removed from the home of the parent whose rights are being terminated. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *5 (Tenn. Ct. App. Sept. 30, 2014).

The record before us reflects that the trial court entered a "Bench Order – Custody to DCS" on August 12, 2015, removing the Child from the custody of Mother and placing the Child in the custody of DCS. The trial court subsequently found on October 12, 2015, by clear and convincing evidence, that the Child was dependent and neglected while in Mother's care, due in part to Mother's incarceration. Therefore, the record supports the trial court's finding that the Child was removed from Mother's custody and placed into foster care as the result of proceedings in the trial court wherein the Child was found to be dependent and neglected.

In ordering the Child's removal from Mother's custody, the trial court found that DCS was not required to exert reasonable efforts to prevent the Child's removal from the home at that time due to the emergency nature of the circumstances. However, in order to satisfy this ground for termination, DCS was required to make reasonable efforts to assist Mother in establishing a suitable home for the Child for a period of four months following the Child's removal from Mother's custody. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii). In its final judgment, the trial court found that DCS had made reasonable efforts to assist Mother in establishing a suitable home for the Child during the applicable time period. Upon careful review, we agree.

During trial, Molly Dempsey, a DCS family services worker, testified regarding the efforts that DCS had made to assist Mother. Ms. Dempsey testified and the trial court found that while the Child was in DCS custody, DCS had (1) provided Mother with a Maury County Resource Guide, which provided Mother with information regarding housing assistance; (2) offered to perform a walk-through of Mother's residence to ensure it was safe and appropriate for the Child; (3) offered to conduct criminal background checks on all individuals residing in Mother's home; (4) developed and revised permanency plans to assist Mother in remedying the reasons necessitating foster care; (5) provided therapeutic visitation for Mother and the Child to assist Mother with parenting skills; (6) made referrals for Mother's alcohol and drug assessment and treatment; (7) conducted random drug screens; and (8) made referrals for Mother's mental health assessment and treatment, including treatment for domestic violence and trauma issues. The evidence preponderates in favor of the trial court's finding that DCS made reasonable efforts to assist Mother in establishing a suitable home for the Child.

Establishing a suitable home for a child entails more than merely providing an appropriate physical location to reside. *See In re Navada N.*, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016); *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A suitable

home for a child requires a safe and stable environment in which the child may reside with a proper caregiver who can provide the appropriate care and attention necessary to meet the child's needs. *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017). Additionally, this Court has determined that "a parent's compliance with counseling requirements is 'directly related to the establishment and maintenance of a suitable home.'" *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016).

Despite DCS's efforts, the trial court determined that Mother had made no reasonable efforts to provide a suitable home and that her actions had "demonstrate[d] a lack of concern for the child to such a degree that it appears unlikely that [she] will be able to provide a suitable home for the child at an early date." Specifically, the trial court found that Mother had failed to address her mental health issues because she had attended only five of her mental health therapy appointments during the fourteen months prior to the termination trial. The trial court further found that Mother had failed to maintain stable employment as evinced by her testimony that she had held approximately nine different jobs during the time the Child continued in DCS custody.

Additional evidence supported the trial court's determination that Mother failed to maintain stable housing. Mother stated that she had resided in eight different places in the fourteen months the Child was in DCS custody. The trial court emphasized that Mother had stayed with friends and relatives and, on two occasions, had moved in with individuals for whom she was providing in-home care during short periods of time. At the time of trial, Mother was residing with another individual, and the landlord had been awarded possession of Mother's home due to nonpayment of rent. Although recognizing that Mother had paid the rent arrearage balance and that the landlord had ultimately allowed her to remain in the home, the trial court found that "it is clear that [Mother] has failed to maintain stable housing."

Upon a thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Mother abandoned the Child by failing to provide a suitable home. We therefore affirm this statutory ground for termination of Mother's parental rights.

### B. Substantial Noncompliance with Permanency Plans

Mother also contends that the trial court erred by finding clear and convincing evidence that she failed to substantially comply with the reasonable responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as a ground for termination of parental rights:

There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

To terminate a parent's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

> Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> > In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

> *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

Mother argues that the trial court erred by failing to review "whether [Mother's] failure to comply with the plan was substantial in light of the importance of the

- 10 -

requirements to the overall plan." The trial court ratified an initial permanency plan on October 12, 2015, which was developed on September 9, 2015, and determined that certain requirements as to Mother were reasonably related to remedying the reasons necessitating foster care. Pursuant to the plan, Mother was required to (1) sign a release to allow DCS to obtain drug screen results from the provider, (2) comply with random pill counts by DCS, (3) submit to random drug screens, (4) not allow the Child around any abuse of alcohol or drugs, (5) obtain and maintain stable housing for a minimum of four months "with no interruption of house payments or services such as electric and water," (6) notify DCS when she obtained a home in order for a home study to be conducted, (7) maintain a legal income to provide stability for the Child, (8) complete a mental health intake appointment and be open and honest with the counselor, (9) address domestic violence and trauma through counseling, (10) sign a release for DCS to obtain mental health records, (11) attend all court hearings, (12) follow all court orders, (13) avoid new criminal charges, and (14) provide DCS with documentation regarding her current criminal charges.

A second permanency plan was developed on January 12, 2016, and ratified by the trial court on February 1, 2016. This plan provided that Mother would complete the same requirements as in the previous plan and included an additional requirement that Mother "provide proof of housing such as [a] lease or employment agreement."[4] The permanency plan further instructed that DCS would need to complete a background check concerning all individuals residing in Mother's home or with whom Mother was residing.

A third permanency plan was developed on July 8, 2016, and ratified by the trial court on October 10, 2016. We note that the expected achievement date on this plan was January 2017, approximately two months prior to trial. The plan included the same requirements for Mother as in previous plans and contained additional requirements that Mother would (1) submit pay stubs to DCS as proof of her "consistent legal means of income" and (2) follow all rules of her probation and "check in" with her probation officer one time per week. In its final order, the trial court determined that the requirements contained in the third permanency plan were reasonably related to remedying the reasons necessitating foster care.

With respect to this statutory ground, the trial court focused on Mother's failure to comply with the permanency plan requirements regarding stable housing, stable employment, and mental health therapy in concluding that Mother failed to substantially comply with the responsibilities in the permanency plans. On appeal, Mother does not argue that she complied with her mental health therapy appointments but instead claims

---

[4] DCS included an employment agreement as proof of housing due to Mother's employment during the case as a home health care provider sometimes residing in the home of her patient.

that "it was not an important part of the plan." As noted above, the trial court determined that the requirements in the permanency plans were reasonable and related to remedying the reasons necessitating foster care. Upon careful review of the record, we agree.

The evidence presented at trial demonstrated that Mother and Father had a history of domestic violence during their relationship. Mother testified to abuse that she suffered at the hands of Father. Mother had previously pled guilty to vandalism and domestic assault on January 6, 2014. Additionally, the Child entered DCS custody following Mother's arrest for violation of a no-contact order between Mother and Father. In each permanency plan, a desired outcome was for Mother to have her "mental health needs" met. As part of her therapy, Mother was to address domestic violence and trauma counseling. Mother was scheduled to attend therapy once a month but only attended five of the scheduled appointments from November 2015 through December 2016. Based on the evidence, we disagree with Mother's assertion that this was not an important action step to complete in order for her to provide a safe home for the Child.

Also included in the permanency plans was a requirement that Mother would maintain "a consistent legal means of income in order to provide stability" for the Child. As part of the July 8, 2016 permanency plan, Mother was required to submit copies of her paystubs as proof of employment. According to Ms. Dempsey, Mother had only presented one paystub during the entire time the Child was in DCS custody.

At trial, Mother related that she had several jobs during the pendency of the case and stated that she was never unemployed. The trial court found that Mother had changed jobs on nine different occasions in the fourteen months prior to trial and that Mother had failed to "provide proof of employment on more than one or two occasions, which falls far short of compliance with the requirement." The trial court accordingly determined that Mother had failed to maintain stable employment. We agree with the trial court that having a consistent and legal means to financially provide for the Child is an important factor in caring for the Child. Moreover, the evidence preponderates in favor of the trial court's finding that Mother had not maintained stable employment or provided proof of her employment to DCS or the court throughout the time the Child was in DCS custody.

In addition, Mother's lack of stable housing has been a consistent concern throughout the dependency and neglect action as evinced by the inclusion in all three permanency plans submitted to the trial court of a goal that Mother would provide a safe and stable home for the Child. During trial, Ms. Dempsey testified that Mother had not provided her with a copy of Mother's lease agreement. Ms. Dempsey further explained that Mother had reported to DCS that Mother had lived at approximately ten or eleven locations during the pendency of the DCS matter and that Mother had not lived at any of

those places for more than four consecutive months. The trial court found that Mother had changed residences eight times during the fourteen months prior to trial.

The record demonstrates that Mother was provided notice to vacate the premises of her current residence by the landlord on January 13, 2017. Court documents reflect that Mother's landlord was awarded possession of the property on February 13, 2017, due to nonpayment of rent. Ms. Dempsey noted that she was unaware of where Mother was currently living after Mother had been evicted in February 2017. Mother, however, provided two handwritten receipts that she alleged were rental payment receipts. One reflected, "from SB," and another indicated, "from SB to BC." Mother testified that her landlord had allowed her to remain in the home following the eviction because she had paid the rental arrears she owed in February 2017. Concerning the matter, the trial court determined that although Mother was allowed to remain in her home after becoming current on rental payments, she had not complied with the permanency plan requirement that she maintain stable housing without having interruption in rental payments.

By Mother's admission, she had fallen behind on her rental payments. The permanency plans required Mother to maintain a stable residence for a period of at least four months without an interruption in rental payments or utility services. According to Mother, she had been in her current residence for more than four consecutive months at the time of trial after her landlord allowed her to remain in the residence. Mother testified that she paid toward her arrearage in February 2017, only one month prior to trial. Even had Mother paid rent and utilities in a timely fashion in February and March of 2017, she still had not maintained a stable residence without an interruption in her rental payments for a period of four months by the time of trial. Ergo, we agree with the trial court that Mother did not comply with this requirement of the permanency plans.

Mother further asserts that a fourth permanency plan had not been approved by the trial court prior to the termination trial and that "there was no way the court could review whether substantial requirements of the plan had been met." We note that there were three permanency plans admitted as exhibits during trial. The permanency plan dated March 21, 2017, with an "Outcome Expected Achievement Date" of July 2017, was not entered as an exhibit during trial and does not appear to have been considered by the trial court when making its finding that Mother had not substantially complied with the requirements of her permanency plans.

Development of permanency plans for all children in foster care is required by Tennessee Code Annotated § 37-2-403 (2014), which requires that a permanency plan be developed initially within thirty days following the child's placement into foster care and a reevaluation and update to the plan at least annually. Additionally, DCS's administrative policy provides that permanency plans will be updated at least every six months for most children upon the expiration of the goal achievement date and no less

often than annually. *See generally* Tenn. DCS Policy 16.31(I) (Mar. 29, 2018). Because of the continuous updating of permanency plans either every six months or annually, it is not surprising that ratification of an updated permanency plan was pending before the trial court at the time of the termination trial date. *See* Tenn. Code Ann. § 37-2-403.

Moreover, we note that the fourth permanency plan in the instant case contains almost identical action steps for Mother to those in the previous plans. During trial, the previous permanency plans were entered into evidence as exhibits, and testimonial evidence was presented regarding Mother's progress on her responsibilities as set forth in the permanency plans. We therefore disagree with Mother's contention that the trial court was unable to ascertain her progress in accordance with the permanency plans without consideration of the fourth plan.

We commend Mother on complying with the visitation and drug screen provisions of her permanency plans. However, considering all of the relevant evidence in the record, we conclude that the evidence preponderates in favor of the trial court's determination by clear and convincing evidence that Mother failed to substantially comply with the reasonable requirements of the court-approved permanency plans.

## C. Persistence of Conditions

The trial court also determined that the ground of persistence of the conditions leading to the Child's removal from Mother's home had been proven by clear and convincing evidence. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:

(3)     The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)     The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

- 14 -

(C)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

A prior court order adjudicating the child to be dependent, neglected, or abused is an essential requirement of a court's termination of parental rights upon the ground of persistence of conditions. *See In re Audrey S.*, 182 S.W.3d at 874. As this Court explained, the statutory ground of persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *See id.* In the case at bar, the Child was removed from Mother's custody in August 2015 after Mother was arrested for violating a no-contact order between Father and her. The trial court subsequently entered an order in October 2015, finding the Child to be dependent and neglected due to the parents' incarceration. Regarding the statutory ground of persistence of conditions, the trial court based its determination on Mother's failure to maintain stable housing, failure to maintain stable employment to provide for the Child, and failure to address her mental health issues.

As previously noted, Mother had lived in approximately eight different residences while the Child was in DCS custody and had failed to remain in one location for more than four months until her most recent home. Regarding Mother's most recent residence, the landlord provided her with written notice of eviction in January and, through legal proceedings, was awarded possession of the residence in February 2017 due to nonpayment of rent. According to Mother, she remained in the residence at the time of trial in March 2017. Although Mother was allowed to remain in the home after tendering the unpaid rent, the trial court found that Mother had not maintained a stable home. The trial court further found that Mother had changed employment approximately nine times in the fourteen months prior to trial. Additionally, the trial court found that Mother had missed all but five of her mental health therapy appointments, "leaving her domestic violence and trauma issues unresolved and untreated."

By reason of these circumstances, the trial court found by clear and convincing evidence that Mother had not remedied the conditions that led to the Child's removal from her custody and that other conditions persisted that would, in all probability, cause the Child to be subjected to further abuse and neglect. The trial court also found that there was little likelihood that Mother would remedy these conditions at an early date and that continuation of the legal parent-child relationship would greatly diminish the Child's chances of early integration into a stable and permanent home.

We recognize that Mother had made progress by beginning to address her alcohol and drug issues and had passed two hair follicle drug screens prior to the termination trial. However, Mother was still unable to provide a stable home for the Child, and she

had failed to address her mental health concerns. Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that the conditions leading to removal still persisted and that other conditions persisted that would in all probability cause the Child to be subjected to further abuse and neglect. We therefore affirm this statutory ground for termination of Mother's parental rights.

### D. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Child

Mother asserts that DCS failed to provide clear and convincing evidence to support termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (2017). This subsection, which was added to the statutory framework effective July 1, 2016, *see* 2016 Tenn. Pub. Acts, Ch. 919 § 20 (S.B. 1393), provides as an additional ground for termination:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Upon our careful review of the record, we determine that the trial court did not err in finding that clear and convincing evidence existed to support this statutory ground for termination of Mother's parental rights.

This Court has recently explained the following with regard to this ground for termination of parental rights:

> Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*
>
> * * *
>
> We have made the following observations about what constitutes "substantial harm":

- 16 -

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted). This Court has held that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018); *but see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (reversing this ground for termination when parents were unable but willing to assume custody and financial responsibility of their children).

In the case at bar, the evidence demonstrated that Mother had failed to manifest a willingness and ability to assume legal and physical custody of or financial responsibility for the Child. The Child has remained in DCS custody since August 12, 2015. During that time, Mother had failed to provide a stable home to which the Child could return. The evidence further demonstrated that Mother had changed residences numerous times throughout the case and was never able to maintain a residence for more than four months without an interruption in rental payments. Mother's landlord initiated court proceedings against Mother due to nonpayment of rent and was granted possession of the property on February 13, 2017. According to Mother's testimony, she had paid toward her arrearage payments, and the landlord had permitted her to remain in the home. The judgment granting the landlord possession of the property was entered approximately one month prior to the termination trial on March 24, 2017. Additionally, the trial court found that Mother had not maintained stable employment to support the Child because she held approximately nine different jobs during the time the Child was in DCS custody. Furthermore, Mother had failed to address her mental health issues and had attended only

five of her therapy appointments, leaving her domestic violence and trauma issues unaddressed.

Based on the foregoing circumstances, the trial court found that Mother had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child. For those same reasons, the trial court also determined that placing the Child in Mother's custody would pose a risk of substantial harm to the physical and psychological welfare of the Child. We note that the stability of Mother's home is relevant to the substantial harm analysis inasmuch as it demonstrates whether the Child would be at risk of substantial harm if placed in that environment. *See Blair v. Badenhope*, 77 S.W.3d 137, 157 (Tenn. 2002), *superseded by statute on other grounds*.

We conclude that the evidence does not preponderate against the trial court's findings by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child and that placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. Accordingly, and considering our affirmance of the other three statutory grounds at issue, we affirm the trial court's findings regarding the existence of statutory grounds for termination of parental rights.

## V.  Best Interest of the Child

Mother contends that DCS did not present sufficient evidence to support the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) (2017) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171

- 20 -

S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In this case, the trial court considered the statutory factors in concluding that those factors weighed against maintaining Mother's parental rights to the Child. Relevant to Tennessee Code Annotated § 36-1-113(i)(1), the trial court found that Mother had failed to make such an adjustment in her circumstances, conduct, or conditions that would make it safe and in the Child's best interest to be placed in her care. The Child was removed from Mother's custody due to the latter's incarceration. During the fourteen months prior to trial, Mother had not maintained a stable home to which the Child could return. Mother had changed residences repeatedly throughout the dependency and neglect action and had often stayed with friends and relatives for short periods of time. Ms. Dempsey testified that individuals were present in Mother's home during visits with the Child who had not been preapproved to be present during the visits. Mother had failed to address her mental health issues and had attended only five of her scheduled therapy appointments with her mental health provider. Consequently, the trial court found that Mother had failed to make it safe for the Child to return to her home. Although factor (2) was not expressly included in the trial court's judgment, the trial court also determined, as relevant to factor (2), that DCS had made reasonable efforts to assist Mother in the four months following the Child's removal and that it appeared unlikely that Mother would to be able to provide a suitable home for the Child at an early date, despite efforts by DCS to assist Mother.

The trial court also did not specifically address factors (3) and (4) in its best interest analysis. Regarding these factors, we note that Mother maintained visitation and a relationship with the Child. Accordingly, Foster Mother testified that she believed it was important to allow the parents to continue some involvement with the Child.

In its best interest analysis, the trial court appeared to focus significantly upon the Child's bond with the foster parents, who wished to adopt the Child. Pursuant to factor (5), the trial court determined that the Child had developed a close relationship with the foster family. Foster Mother is the Child's biological aunt and has cared for the Child during the entirety of time the Child has been in foster care, such care encompassing approximately one-third of the Child's life. The trial court recognized in its final judgment that the Child depended on Foster Mother for her daily needs and that the Child viewed the foster home as "her home." The trial court also determined that a change of

caretakers and a return of custody to the parents would disrupt the Child's life and would not be in the Child's best interest.

Relevant to statutory factor (6), the trial court found that inasmuch as the Child had been removed from Mother following her incarceration for violating a no-contact order, the parents had abused and neglected the Child due to their criminal activity and incarceration. As to factor (7), Foster Mother testified that Mother became hospitalized due to an overdose in March 2016 on a day when Mother was to have enjoyed a visit with the Child. Mother acknowledged that she had been taking Xanax at the time. According to Mother, she accompanied friends to a "show" and had a "few drinks," and her friends had returned her home afterward. Mother claimed that she remembered her friends' leaving her at home but that she subsequently awoke in the hospital. Following the incident, Mother did pass two hair follicle drug screens prior to trial. However, noting also that Mother had changed residences eight times in the fourteen months preceding trial, the trial court determined that Mother's home was unsafe and unhealthy for the Child.

Although the trial court did not specifically address factor (8) concerning Mother's mental state, the trial court did determine that Mother had not complied with her mental health therapy, "leaving her domestic violence and trauma issues unresolved and untreated." With respect to factor (9) and child support, Mother had been incarcerated on two occasions due to civil contempt for failure to pay child support concerning her three children, including the Child. However, the evidence reflected that Mother had paid toward her arrearage balance prior to trial.

Based on our thorough review in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Mother's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Bethany C.

_____
THOMAS R. FRIERSON, II, JUDGE